UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| LAKISSA D. WILLIAMS, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | CIVIL NO. 2:10 cv 425 |
| | ) | |
| UNITED STATES STEEL CORPORATION, | ) | |
| | ) | |
| Defendant | ) | |

OPINION AND ORDER

This matter is before the court on the Motion for Summary
Judgment [DE 18] filed by the defendant, United States Steel
Corporation, on February 29, 2012.  For the reasons set forth
below, the motion is **GRANTED**.

Background

In 2005, the plaintiff, Lakissa Williams, was hired by the
defendant, U.S. Steel, at its Gary, Indiana steel manufacturing
facility (Gary Works) as a Labor Grade 1 in the Tin Products
Division.  She was promoted to Labor Grade 2, Utility Technician,
on February 6, 2007, and held this position at all times relevant
to her complaint.  Williams is a member of the United Steel,
Paper and Forestry, Rubber, Manufacturing, Energy, Allied Indus-
trial and Service Workers International Union, AFL-CIO/CLC.  U.S.
Steel and the Union negotiated a Basic Labor Agreement (BLA)
which governed the terms of employment for labor employees at
Gary Works.  The BLA gave U.S. Steel the exclusive right to

manage the business and direct the working forces, grievances and arbitration, suspensions and discharges, and wages and incentives.  Under the BLA, an employee who temporarily was assigned at the request or direction of the company to another job was to receive the established rate of pay for the job performed and to receive special allowances as may be required to equal the earnings that otherwise would have been realized by the employee.

As explained in the BLA, Utility Technicians are responsible for operating equipment and performing tasks that support operations of the various production units and for working with materials and equipment to handle, transport, and process product and materials.  Utility Technicians in the Tin Coating Department perform various production line functions (Solution Tender, Feeder, Shearman, and Piler) and non-line functions (Stocker and Ram Tractor).  Utility Technicians receive the same base rate of pay regardless of whether they perform line or non-line functions, but incentives vary depending upon production and whether the Utility Technician works a line or non-line job.  Utility Technicians working on the line generally earn more incentive pay than Utility Technicians performing non-line functions.

Between January and June 2009, Williams primarily was assigned to the line as a Shearman.  In February 2009, Williams began experiencing difficulty with her asthma and requested

2

intermittent leave under the Family and Medical Leave Act (FMLA). Williams' certifying physician estimated that she would require one to two days of leave per month, however, Williams missed five shifts in April, three shifts in May, and five shifts in June. When Williams was unable to report for work, U.S. Steel had to pay another employee to work overtime or the production would shut down.  According to U.S. Steel, this increased its production costs.

Beginning in July 2009, U.S. Steel assigned Williams to the non-line Stocker and Tractor Driver functions.  U.S. Steel states that it removed Williams from the line position to minimize overtime costs because of Williams' frequent FMLA leave.  The Stocker and Tractor Driver functions fall within the job description for Utility Technician.  Williams received the same base pay and non-line incentives as male employees working non-line positions.

The union filed a grievance challenging Williams' removal from the line.  U.S. Steel denied the grievance, stating that Williams was placed in the less critical function of tractor operator due to her consistent absences from work related to her FMLA leave, which increased U.S. Steel's overtime costs.  The BLA provided for additional levels of review, but the union chose not to pursue Williams' grievance any further.  U.S. Steel reassigned Williams to the line by January or February 2010 and reinstated

her line incentives.  At her deposition, Williams admitted that U.S. Steel moved her from the Shearman position based solely on her FMLA absences.

Williams filed a charge against U.S. Steel with the EEOC, claiming she was subject to gender discrimination and harassment. The EEOC chose not to pursue Williams' complaint and issued a Notice of Rights on July 26, 2010.  Williams filed her complaint with this court on October 26, 2010, alleging gender discrimination, harassment, and various state law claims, including negligent supervision and retention and intentional infliction of emotional distress.

Williams' EEOC charge centered around her removal from the line position and subsequent reduction in incentive pay.  At her deposition, Williams testified that she was subject to gender harassment because she was sent home from work, assigned meaningless tasks, and denied access to a shanty to warm up on cold days.  Specifically, Williams complains that she was scheduled to work as an Exit Driver on August 5, 2009, and upon arrival, was asked to work on the line in the Shearman position.  Williams had taken cold medication earlier that day and was sent to the plant medical facility for evaluation regarding her fitness to perform the requirements of the Shearman position.  The plant medical facility concluded that she could return to work in the capacity

4

she originally was scheduled but could not perform the Shearman position.  Instead of allowing her to work her assigned position, U.S. Steel management sent Williams home.  She was not allowed to return until she received a medical release, and she missed work between August 5, 2009 and August 11, 2009.

Williams also complained that her foreman, Derek Cheeseborough, began harassing her through a discipline issued in May 2009.  On May 17, 2009, Cheeseborough disciplined Williams for failing to report off.  Under its progressive discipline principles, U.S. Steel issued two five day suspensions to Williams for improperly reporting off and being absent without cause.  U.S. Steel subsequently removed the suspensions during the grievance procedure, and Williams did not serve the suspensions.  Williams also referenced a notice that Cheeseborough posted for the crews which stated "due to the recent increased [sic] in call offs, you will be required to work as scheduled!!  We will no longer accept shift trades or giving away scheduled OT turns as of today."  Williams believed the notice was directed at her.

Williams also identified co-workers who missed work and were not removed from their line positions.  Williams first pointed to Jack Overturf, who worked on the line as a Solution Tender and eventually was given a special assignment to accommodate his FMLA absences.  Overturf's special assignment included assisting

5

lesser experienced Solution Tenders with functions they were not capable of performing, such as monitoring tank levels, starting and stopping pumps, and opening/closing valves.  Overturf received line incentive pay during his special assignment.  U.S. Steel represents that Overturf received the line incentive pay because the work supported the Solution Tender functions, which was line work.

Williams also identified Roy Frost, another U.S. Steel employee who had been threatened with removal from his line position due to excessive FMLA leave.  Williams states that she was personally aware that Frost had used more FMLA leave than she had.  Frost also worked as a Shearman, but U.S. Steel contends that Frost's attendance dramatically improved as a result of discipline issued against him on March 3, 2010, and for this reason, U.S. Steel did not remove him from the line.

Williams also pointed to instances where U.S. Steel management corrected the pay given to male employees who complained they were incorrectly paid.  Williams testified that Doug Lillie worked the Tractor due to a scheduling need and initially was paid the non-line incentive.  An unknown manager allegedly paid Lillie the line incentive after he complained.  Another employee, whom Williams knew only as "Big D", was a Solution Tender but sometimes worked the Tractor due to scheduling issues and re-

ceived the line incentive.  Williams also pointed to Kevin
Oliver, who complained when Williams, who had less seniority, was
assigned to a line position over him.  Oliver was allowed to work
the non-line position but received line incentive.  At her depo-
sition, Williams admitted Oliver was paid correctly under the BLA
because the error was due to a scheduling problem.  Williams also
referenced Walker Steel and Harold Frank, who had their pay
corrected by management, although Williams did not know the basis
of the errors.  Finally, Williams identified Jonathan Haywood,
who was moved from a Labor Grade 4 Operator position to a Shear-
man position and still received the Labor Grade 4 wage.  Hay-
wood's removal from the Operator to the Shearman position was
prompted by a discipline he received in June 2009.  U.S. Steel
has explained that Haywood had quality issues shortly after
becoming an Operator, which resulted in a five-day suspension.
U.S. Steel and the Union agreed to move Haywood to the Shearman
position as an alternative to discipline so he could train longer
with other Operators.

U.S. Steel now moves for summary judgment on all of Wil-
liams' claims.

## Discussion

Pursuant to Federal Rule of Civil Procedure 56(c), summary
judgment is proper only if it is demonstrated that "there is no

genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Kidwell v. Eisenhauer,* 679 F.3d 957, 964 (7th Cir. 2012); *Stephens v. Erickson,* 569 F.3d 779, 786 (7th Cir. 2009).  The burden is upon the moving party to establish that no material facts are in genuine dispute, and any doubt as to the existence of a genuine issue must be resolved against the moving party. *Adickes v. S.H. Kress & Company*, 398 U.S. 144, 160, 90 S.Ct. 1598, 1610, 26 L.Ed.2d 142, 155 (1970); *Stephens*, 569 F.3d at 786.  A fact is material if it is outcome determinative under applicable law.  There must be evidence on which the jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 212 (1986); *Stephens*, 569 F.3d at 786; *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008).  However, summary judgment may be entered against the non-moving party if it is unable to "establish the existence of an essential element to [the party's] case, and on which [that party] will bear the burden of proof at trial . . .".  *Kidwell*, 679 F.3d at 964 (*citing Benuzzi v. Bd. of Educ.*, 647 F.3d 652, 662 (7th Cir. 2011) (*quoting Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. at 2548).

Summary judgment is inappropriate for determination of claims in which issues of intent, good faith, and other subjective feelings play dominant roles. ***Ashman v. Barrows,*** 438 F.3d 781, 784 (7th Cir. 2006). Upon review, the court does not evaluate the weight of the evidence, judge the credibility of witnesses, or determine the ultimate truth of the matter; rather, the court will determine whether there exists a genuine issue of triable fact. ***Wheeler***, 539 F.3d at 634 (*citing* ***Anderson***, 477 U.S. at 248, 106 S.Ct. at 2510).

In deciding a motion for summary judgment, the trial court must determine whether the evidence presented by the party opposed to the summary judgment is such that a reasonable jury might find in favor of that party after a trial.

> The inquiry performed is the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.
>
> [T]his standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.
>
> ***Anderson***, 477 U.S. at 250, 106 S.Ct. at 2511

*See also* ***Reeves v. Sanderson Plumbing Prods., Inc.***, 530 U.S. 133, 149-151, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105, 120-122 (2000)

9

(setting out the standard for a directed verdict); *Celotex Corp.*, 477 U.S. at 322-23, 106 S.Ct. at 2553; *Stephens,* 569 F.3d at 786; *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008) (stating that a genuine issue is one on which a reasonable fact finder could find for the nonmoving party); *Springer v. Durflinger,* 518 F.3d 479, 483 (7th Cir. 2008)(stating that a genuine issue exists and summary judgment is inappropriate if there is sufficient evidence for a jury to return a verdict for the nonmoving party).

Title VII enables a plaintiff to prove discrimination by direct evidence of discriminatory intent or, where no direct evidence exists, by using the indirect-burden shifting method established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802-805, 93 S.Ct. 1817, 1824-25, 36 L.Ed.2d 668 (1973), and refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1092, 67 L.Ed.2d 207 (1981). *See Moser v. Indiana Department of Corrections*, 406 F.3d 895, 900-01 (7th Cir. 2005).  The direct method requires the plaintiff to show through either direct or circumstantial evidence that the employer's adverse employment action was impermissibly motivated. *Wilkins v. Riveredge Hospital*, 130 Fed. Appx. 823, 828 (7th Cir. 2005).

The most general statement of the *McDonnell Douglas* method of proof is that the plaintiff has the initial burden of showing that: 1) she belongs to a protected group; 2) she was performing to the employer's legitimate expectations; 3) she suffered an adverse employment decision; and 4) the employer treated similarly situated employees who are not in the protected group more favorably. *See Keeton v. Morningstar*, 667 F.3d 877, 884 (7th Cir. 2012); *Moser*, 406 F.3d at 900; *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004); *Williams v. Waste Management of Illinois, Inc.*, 361 F.3d 1021, 1029 (7th Cir. 2004). This framework is flexible and may be adapted to fit each case. *Burdine*, 450 U.S. at 253 n.6, 101 S.Ct. at 1094 n.6; *Wohl v. Spectrum Manufacturing, Inc.*, 94 F.3d 353, 359 (7th Cir. 1996).

Once the plaintiff has met this initial burden, "a presumption of discrimination arises, and the employer must articulate a legitimate, nondiscriminatory reason for its employment action." *Moser*, 406 F.3d at 895; *O'Neal*, 392 F.3d at 911. The defendant's burden is not one of persuasion, but rather of production and "can involve no credibility assessment." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509, 113 S.Ct. 2742, 2748, 125 L.Ed.2d 407 (1993); *Reeves*, 530 U.S. at 142, 120 S.Ct. at 2106. The burden then shifts back onto the plaintiff to show that the reason given by the defendant is just a pretext for discrimina-

11

tion. ***Moser***, 406 F.3d at 900-01. The plaintiff cannot establish pretext merely by showing that the "reason was doubtful or mistaken." ***Crim v. Board of Education of Cairo School District No. 1***, 147 F.3d 535, 541 (7th Cir. 1998).  Rather, the plaintiff must show that the employer is lying or that the employer's reasoning has no basis in fact. ***Guerrero v. Ashcroft***, 253 F.3d 309, 313 (7th Cir. 2001); ***Ransom v. CSC Consulting, Inc.***, 217 F.3d 467, 471 (7th Cir. 2000); ***Crim***, 147 F.3d at 541.

Despite the shifting burden of production, the ultimate burden of persuasion remains at all times with the plaintiff. ***Moser,*** 406 F.3d at 901; ***Haywood v. Lucent Technologies, Inc.***, 232 F.3d 524, 531 (7th Cir. 2003); ***Stockett v. Muncie Indiana Transit System***, 221 F.3d 997, 1001 (7th Cir. 2000).  A plaintiff alleging discrimination, however, has a lesser burden when proceeding on a summary judgment motion.  In ***Anderson v. Baxter Healthcare Corp.***, 13 F.3d 1120 (7th Cir. 1994), the Seventh Circuit stated:

> Both ***McDonnell Douglas*** and [***St. Mary's Honor Center v. Hicks***, 509 U.S. at 507, 113 S.Ct. at 2747] speak to the burden the plaintiff bears at trial.  However, for summary judgment purposes, the nonmoving party, in this case the plaintiff, has a lesser burden.  He must only "produce evidence from which a rational fact-finder could infer that the company lied" about its proffered reasons for dismissal.

13 F.3d at 1124 (*quoting **Shager v. Upjohn**,*
913 F.2d 398, 401 (7th Cir. 1994))

*See also **Plair v. E.J. Brach & Sons, Incorporated**,* 105 F.3d 343,
349 (7th Cir. 1997); ***Cliff v. Board of School Commissioners of
the City of Indianapolis, Indiana**,* 42 F.3d 403, 412 (7th Cir.
1994).  If the plaintiff is unable to meet her burden, her claims
must fail.

Williams has not presented direct evidence of discrimination
and has chosen to proceed on the indirect method of proof.
Williams was a member of a protected class, women.  The parties
dispute whether she was performing in accordance with U.S.
Steel's legitimate expectations, suffered an adverse employment
decision, and was treated less favorably than similarly situated
employees who were not in the protected group.

U.S. Steel argues that Williams was not performing in
accordance with its expectations because her frequent absences
were incompatible with working on the line and caused U.S. Steel
to incur overtime costs. Williams' leave also exceeded expecta-
tions of her treating physician.  Williams responded that she was
exercising her statutory right by seeking leave under the FMLA
for her condition and that her frequent absences due to her
medical condition alone are insufficient to establish that she
was not meeting her employer's legitimate expectations.

The Family Medical Leave Act, 29 U.S.C. §2612, states that
"an eligible employee shall be entitled to a total of 12 work-
weeks of leave any 12-month period for one or more of the follow-
ing: . . . (D) Because of a serious health condition that makes
the employee unable to perform the functions of the position of
such employee."  The FMLA makes it unlawful for an employer to
"interfere with, restrain, or deny the exercise of or the attempt
to exercise, any right provided under [the Act]".  29 U.S.C.
§2615(a)(1).  The FMLA also provides that it is "unlawful for any
employer to discharge or in any other manner discriminate against
any individual for opposing any practice made unlawful by this
subchapter."  29 U.S.C. §2615(a)(2).  Specifically, the employer
may not discharge or discriminate in any manner against an
employee who has filed a charge or instituted a proceeding under
the Act, who has given information in connection with a proceed-
ing under the Act, or who has testified in any proceeding relat-
ing to a right provided under the Act.  29 U.S.C. §2615(b).

Interference arises when an employer either refuses to allow
FMLA leave or discourages an employee from taking leave to which
she is entitled.  29 C.F.R. §825.220(b); *Dean v. Wackenhut Corp.*,
2011 WL 610946, *3 (N.D. Ill. Dec. 7, 2011); *Stallings v. Huss-
mann Corp.*, 447 F.3d 1041, 1050 (8th Cir. 2006).  An employer
violates this provision when it takes some action to deter an

14

employee from participating in an activity protected by the FMLA
by interference or restraint, such as attaching negative conse-
quences to the exercise of protected rights.  ***Stallings***, 447 F.3d
at 1050 (*citing **Bachelder v. Am. W. Airlines, Inc**.*, 259 F.3d
1112, 1124 (9th Cir. 2001)).  To establish a claim for interfer-
ence, the employee must show both that she was entitled to a
benefit under the FMLA and that her employer interfered with her
"substantive rights under the FMLA for a reason connected with
[her] FMLA leave." ***Stallings***, 447 F.3d at 1050.  An employer is
not strictly liable for every discharge during FMLA leave, and
suspicious timing alone is insufficient to establish a violation
of the interference clause.  ***Kidwell***, 679 F.3d at 966 (The reason
is obvious: "[s]uspicious timing may be just that — suspicious —
and a suspicion is not enough to get past a motion for summary
judgment.")(*citing **Loudermilk v. Best Pallet Co.**,* 636 F.3d 312,
315 (7th Cir. 2011) (citation omitted)).  Rather, it must be
established that the employer's reason for imposing negative
consequences was related to the FMLA leave.  Although the em-
ployee does not need to prove intent, she must show by direct or
circumstantial evidence that the FMLA leave was a factor consid-
ered by the employer when making the decision to impose negative
consequences.

The Seventh Circuit also has recognized a cause of action for retaliation under the FMLA. *Kauffman v. Federal Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005). "[T]he difference is that [a claim for retaliation] requires proof of discriminatory or retaliatory intent while [interference] requires only proof that the employer denied the employee his or her entitlements under the Act." *Kauffman*, 426 F.3d at 884. Both interference and retaliation may be shown when an employer does not return an employee to an equivalent position upon return from FMLA leave. "An employee is entitled to be returned to the same position the employee held when leave commenced, or to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment." 29 C.F.R. §825.214.

U.S. Steel does not dispute that Williams was entitled to FMLA leave. In fact, U.S. Steel granted her intermittent leave upon every request. Although U.S. Steel is correct that Williams is not asserting a claim for interference or retaliation under the FMLA, Williams' statutory rights remain pertinent to the analysis to determine if U.S. Steel's expectations were legitimate.

The Seventh Circuit has explained that it "will not second guess an employer's policies that are *facially* legitimate." *Brummett v. Lee Enterprises, Inc.*, 284 F.3d 742, 745 (7th Cir.

16

2002) (emphasis added).  By its own admission, U.S. Steel moved
Williams from a line position to a non-line position that gener-
ally earns lower incentive pay due to her frequent requests for
FMLA leave.  Although attendance may be a legitimate expectation
for employment, it is not facially legitimate to enforce a policy
that is contrary to an employee's statutory right to leave.  The
FMLA protects employees from negative consequences in the wake of
taking FMLA leave.  By moving Williams from the line to a posi-
tion that typically earns lower incentive pay, U.S. Steel, if
nothing more, discouraged Williams from taking FMLA leave and
interfered with her statutory rights.  The court is unwilling to
find that a policy that controverts an employee's statutory
rights is facially legitimate.  For this reason, the court will
consider Williams' behavior compared to all of U.S. Steel's
legitimate policies.

The parties next dispute whether Williams suffered from an
adverse employment decision.  The Seventh Circuit broadly defines
the phrase "adverse employment action" to mean "one that is
materially adverse, meaning more than a mere inconvenience or an
alteration of job responsibilities." *Hilt-Dyson v. City of
Chicago*, 282 F.3d 456, 465 (7th Cir. 2002) (quotation and cita-
tion omitted).  *See Arizanovska v. Wal-Mart Stores, Inc.*, 682
F.3d 698, 703 (7th Cir. 2012).  Under this definition, the court

17

recognizes three categories of materially adverse employment
actions:

> (1) cases in which the employee's compensa-
> tion, fringe benefits, or other financial
> terms of employment are diminished, including
> termination; (2) cases in which a nominally
> lateral transfer with no change in financial
> terms significantly reduces the employee's
> career prospects by preventing her from using
> her skills and experience, so that the skills
> are likely to atrophy and her career is like-
> ly to be stunted; and (3) cases in which the
> employee is not moved to a different job or
> the skill requirements of her present job
> altered, but the conditions in which she
> works are changed in a way that subjects her
> to a humiliating, degrading, unsafe, un-
> healthful, or otherwise significantly nega-
> tive alteration in her workplace environment.
>
> *O'Neal*, 392 F.3d at 911; *Arizanovska*, 682
> F.3d at 703

*See also Herrnreiter v. Chicago Housing Authority*, 315 F.3d 742,
744-45 (7th Cir. 2002), *cert. denied*, 540 U.S. 984, 124 S.Ct.
472, 157 L.Ed.2d 375 (2003).

U.S. Steel argues that the non-line position Williams
temporarily was reassigned to was encompassed in the description
for her position and that it was within its discretion to assign
Williams to the line or non-line position as it saw fit under the
terms of the collective bargaining agreement. It is U.S. Steel's
position that Williams was not entitled to the line position, and
absent such an entitlement, its decision was not adverse.  U.S.
Steel also equates the incentive pay to a bonus, arguing that an

employer's denial of a bonus is not an adverse employment action. *See* ***Rabinowitz v. Pena***, 89 F.3d 482, 488-89 (7th Cir. 1996) (adverse performance review resulting in loss of $600 bonus was not an adverse employment action if employee was not automatically entitled to the bonus); ***Miler v. American Family Mutual Insurance Co.,*** 203 F.3d 997, 1006 (7th Cir. 2000) (employer's decision not to give employee a higher raise was not an adverse action).

It would be difficult for the court to conclude that the reassignment was not adverse.  True, Williams' job description encompassed both line and non-line positions.  However, the evidence suggests that the line positions typically were given to employees with greater seniority and that Williams consistently was assigned to line positions prior to her leave.  Williams has pointed to Kevin Oliver, who complained that Williams was assigned to the line despite his seniority and was awarded the line incentive pay for the time he spent completing non-line duties.  U.S. Steel attempts to distinguish this because it was due to a scheduling error.  However, this "scheduling error" suggests that employees with greater seniority had some entitlement to the line positions.  Moreover, Williams consistently performed line work prior to her reassignment.  Given the length of time she spent performing line work, a jury could conclude that the reassignment

19

was adverse.  The Seventh Circuit has acknowledged that discrimi-
nation arises when "financial terms of employment are dimin-
ished."  When she was reassigned to the non-line position, it is
undisputed that Williams experienced decreased "financial terms"
because her incentive pay was diminished.  Williams has demon-
strated that a genuine issue of material fact remains pending on
this issue.

Finally, the parties dispute whether Williams pointed to a
similarly situated employee who was treated more favorably.  "An
employee is similarly situated to a plaintiff if the two employ-
ees not only report to the same supervisor, but also have engaged
in similar conduct without such differentiating circumstances as
would distinguish the employer's treatment of them."  ***Mohamad v.
Board of Trustees of Purdue University***, 2008 WL 2074401, *2 (N.D.
Ind. 2008) (*citing **Snipes v. Ill. Dep't of Corrs.**, 291 F.3d 460,
463 (7th Cir. 2002)).  Williams pointed to several employees who
she alleges were similarly situated.  U.S. Steel attempts to
distinguish each situation from Williams.

First, Williams pointed to Overturf, who received line in-
centive pay during his special assignment to accommodate his FMLA
absences. Both employees worked in the same department, at the
same grade level, for the same management, and requested leave
under the FMLA, resulting in intermittent absences.  U.S. Steel

20

argues that during his reassignment, Overturf continued to do line work, but in a different capacity from his original assignment, and for this reason, he continued to receive line incentive pay.  Although Overturf continued to perform line work and was entitled to line incentives, U.S. Steel has not shown why a similar accommodation could not have been made so Williams could have continued to perform line work in a capacity that would accommodate her condition.  This is insufficient to establish that the circumstances were so adverse as to warrant different treatment.

Williams also identified Frost, who had been threatened with removal from his line position due to excessive FMLA leave. Despite taking more FMLA leave than Williams, Frost was disciplined and remained on the line, earning line incentives.  Again, U.S. Steel attempts to distinguish the situation, arguing that Frost's attendance improved as a result of the threat of removal from the line.  The threat of discipline does not distinguish Frost's situation to the extent that he should be discounted as a similarly situated employee.  Frost was employed at the same labor grade, in the same department, under the same management, and took FMLA leave.  The similarities are clear, yet Williams was treated differently than Frost for taking leave.

21

Williams pointed to additional employees, none of whom requested FMLA leave. Doug Lillie and "Big D" were paid line incentives after working non-line jobs because there was a scheduling need. They had not been absent or taken intermittent leave and did not require a replacement for their line position. This similarity is more attenuated. Williams arguably was reassigned due to scheduling needs and did not receive line incentives.

Williams identified two other employees, Walker Steel and Harold Frank, whom she complained had their pay adjusted, but she could not articulate the reason why management adjusted their pay. Without such information, the trier of fact could not make the appropriate comparison. However, Williams has identified several employees whose situations closely reflect Williams. U.S. Steel's reference to slight differences does not sufficiently distinguish Williams' situation from Overturf and Frost.

There is sufficient evidence before the court for Williams to establish a prima facie case, shifting the burden to U.S. Steel to show a legitimate, non-discriminatory reason for the adverse employment action. U.S. Steel has explained that it transferred Williams to the non-line position because of her excessive intermittent leave requests. When Williams reported off work, U.S. Steel had to find someone to fill her shift and incurred overtime costs. Because the plant could continue to

operate if a non-line employee called off, U.S. Steel found it most efficient to move Williams to the non-line position temporarily.

U.S. Steel has presented a reason for its employment decision that is unrelated to Williams' gender, shifting the burden to Williams to show that the reason U.S. Steel set forth is a pretext. "'Pretext' does not mean that the employer was mistaken in its decision; rather, pretext 'means a lie, specifically a phoney reason for some action.'" ***Tipswod v. Oilvy & Mather, Inc.***, 918 F.Supp. 217, 222 (N.D. Ill. 1996) (*citing* ***Russell v. Acme—Evans Co.,*** 51 F.3d 64, 69 (7th Cir. 1995)). To show pretext without direct evidence, the plaintiff must show "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [her] discharge, or (3) that they were insufficient to motivate discharge." ***Cliff v. Board of Sch. Comm'rs of City of Indianapolis***, 42 F.3d 403, 412 (7th Cir. 1994).

Williams has failed to show any connection between her temporary reassignment to the non-line position and her gender. At her deposition, Williams confirmed U.S. Steel's reason and admitted that her reassignment was due to her intermittent FMLA leave. Williams cannot now take a different position and argue that the reason was given in an attempt to hide U.S. Steel's true

motive.  Nothing of record suggests that U.S. Steel removed Williams from the line for any reason other than her excessive absenteeism.  In fact, Williams pointed to another woman, Adele Crawford, who was permitted to remain on the line despite having several absences, which suggests that U.S. Steel did not reassign Williams because of her gender.  Although Williams may have had a strong case for interference of her rights under the FMLA or retaliation for exercising her rights thereunder, Williams has not requested such relief and has not shown the slightest connection between the adverse employment action and her gender.  The record is devoid of evidence calling U.S. Steel's stated reason for reassigning Williams into question.  By her own admission, U.S. Steel's stated reason for reassignment is accurate.

Williams also complains that she was subject to gender harassment.  Title VII provides that it is unlawful to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. §2000e-2(a)(1).  *See also Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 63, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986).  Included in this "spectrum" is a prohibition against "requiring people to work in a discriminatorily hostile or abusive environment."  *Harris v. Forklift*

24

*Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993).  Thus, "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated."  *Harris*, 510 U.S. at 21, 114 S.Ct. at 370 (quotation marks and citations omitted).

To establish that she was subjected to a hostile work environment, a complainant must show that

> (1) her work environment was both objectively and subjectively offensive; (2) the harassment complained of was based on her gender; (3) the conduct was either severe or pervasive; and (4) there is a basis for employer liability.
>
> *Overly v. KeyBank National Association*, 662 F.3d 856, 862 (7th Cir. 2011)

*See also* *Romansizak-Sanchez v. International Union of Operating Engineers, Local 150, AFL-CIO*, 121 Fed. Appx. 140, 144-45 (7th Cir. 2005)(*quoting* *Hall v. Bodine Electric Company*, 276 F.3d 345, 354-55) (7th Cir. 2002); *Rhodes v. Illinois Department of Transportation*, 359 F.3d 498, 505 (7th Cir. 2004).

A work environment must be both subjectively and objectively offensive in order to be hostile.  *Overly*, 662 F.3d at 862; *Rhodes*, 359 F.3d at 505 (*quoting* *Hilt-Dyson*, 282 F.3d at 463). Whether an environment is objectively hostile depends on "all of

25

the circumstances, including the frequency and severity of con-
duct, whether it is threatening or humiliating, or a mere offen-
sive utterance, and whether it unreasonably interfered with an
employee's work performance." *Romansizak-Sanchez*, 121 Fed. Appx.
at 145 (*quoting* *Smith v. Northeastern Illinois University*, 388
F.3d 559, 566 (7th Cir. 2004). *See also* *Wyinger v. New Venture
Gear, Inc.*, 361 F.3d 965, 975-76 (7th Cir. 2004).

In determining whether harassment is "based on sex" in the
context of a hostile environment claim, "[t]he critical issue
. . . is whether members of one sex are exposed to disadvanta-
geous terms or conditions of employment to which members of the
other sex are not exposed." *Oncale v. Sundowner Offshore Ser-
vices*, 523 U.S. 75, 80, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201
(1998). *See also* *Overly*, 662 F.3d at 863; *Hilt-Dyson*, 282 F.3d
at 462-63. In other words, "an employer cannot be held liable
for creating or condoning a hostile working environment unless
the hostility is motivated by gender." *Berry v. Delta Airlines,
Inc.*, 260 F.3d 803, 808 (7th Cir. 2001). *See also* *Oncale*, 523
U.S. at 80, 118 S.Ct. at 1002 (Ginsburg, J., concurring) (noting
that although harassment "need not be motivated by sexual de-
sire," it must be "clear that the harasser is motivated by gen-
eral hostility to the presence of" a particular gender). *Passan-
anti v. Cook County*, 2012 WL 2948524, *7 (7th Cir. July 20, 2012).

26

Thus, the simple fact that a victim is female does not satisfy
the requirement that the harassment she experienced is based on
her sex. *See **Herron v. Daimlerchrysler Corporation***, 388 F.3d 293,
303 (7th Cir. 2004) (finding that the plaintiff's membership in a
protected class "does not transform" harassment related to him
into harassment related to his race).

Williams has failed to show that she could succeed in prov-
ing any of the elements to establish gender harassment.  Williams
has pointed to three isolated events, namely, she was sent home
the day the medical staff determined she could not work as a
Shearman, she was assigned meaningless tasks, and she was denied
access to a warming shelter on cold days.  Williams has not ex-
panded on these events in her response brief or made an effort to
show that they were severe and pervasive, creating both a subjec-
tive and objective hostile environment.  The record also is
devoid of evidence that Cheeseborough's disciplinary actions
interfered with her work performance or was threatening and
humiliating.

Most notably, there is no evidence that any of these actions
were taken because of Williams' gender.  Williams cannot rely
solely on the fact that she is a woman.  The evidence does not
show that Cheeseborough treated women differently or that he made
statements or engaged in inappropriate conduct because of Wil-

27

liams' gender.  Absent some indication that Williams was sub-
jected to disadvantageous terms or conditions that men were not,
she cannot establish a prima facie case for gender harassment.
Nor has Williams made any attempt to show why U.S. Steel should
be held liable for Cheeseborough's actions.  At this stage of
litigation, Williams must come forth with some information to
support her claims, and she has failed to show she can meet even
one of the elements she bears the burden of proving to succeed on
a claim for gender harassment.

U.S. Steel also moved for summary judgment on Williams'
state law claims for negligent supervision and retention and
intentional infliction of emotional distress.  Williams did not
as much as mention these claims in her response brief.  Any
argument Williams may have raised in objection is considered
waived.  *See Hernandez v. Cook County Sheriff's Office,* 634 F.3d
906, 913 (7th Cir. 2011); *Palmer v. Marion County*, 327 F.3d 588,
598 (7th Cir. 2003).

Indiana has adopted the Restatement (Second) of Torts as the
standard for assessing employer liability for the torts of its
employees.  *Treat v. Tom Kelley Buick Pontiac GMC*, 710 F.Supp.2d
762, 772 (N.D. Ind. 2010).  Section 317 states:

> A master is under a duty to exercise reason-
> able care so to control his servant while
> acting outside the scope of his employment as
> to prevent him from intentionally harming

28

others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if

> (a) the servant
>
> > (i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or
> >
> > (ii) is using a chattel of the master, and
>
> (b) the master
>
> > (i) knows or has reason to know that he has the ability to control his servant, and
> >
> > (ii) knows or should know of the necessity and opportunity for exercising such control.

The claimant must show that the employer hired and retained the employee despite knowing that he was in the "habit of misconducting [him]self in a manner dangerous to others." *Treat,* 710 F.Supp.2d at 772 (*quoting* ***Briggs v. Finley***, 631 N.E.2d 959, 967 (Ind. App. 1994)). A cause of action for this tort accrues when an employee "steps beyond the recognized scope of his employment to commit a tortious injury upon a third party." ***Avila v. U.S. Steel Corp.***, 2010 WL 2710641, *10 (N.D. Ind. July 6, 2010) (*quoting* ***Bd. of School Com'rs of City of Indianapolis v. Pettigrew***, 851 N.E.2d 326, 332 (Ind. App. 2006)). Because Indiana recognizes the doctrine of respondeat superior, these claims are duplicative

and have "no value where an employer has admitted that its em-
ployee was acting within the scope of his employment." ***Avila***,
2010 WL 2710641 at *10 (*citing **Overton v. Foutty & Foutty, LLP**,*
2007 WL 2413026, *7 (S.D. Ind. Aug. 21, 2007)).

U.S. Steel admits that Cheeseborough was acting within the
scope of his employment at the time of each of the events Wil-
liams identified in her response, and Williams has failed to
allege otherwise.  Because Indiana does not recognize a claim for
negligent hiring and retention when the offending party was a
fellow employee acting within the scope of his employment, Wil-
liams has failed to raise a genuine issue of material fact.
Additionally, Williams has not shown that there was a threat of
bodily harm or that U.S. Steel had any reason to know of such a
threat.  Williams was never put in a position that threatened her
well-being.  For these reasons, Williams has failed to identify a
material question of fact that remains pending for the jury to
resolve and summary judgment is granted in favor of U.S. Steel on
these issues.

Finally, Williams claims she suffered from intentional in-
fliction of emotional distress.  "Intentional infliction of emo-
tional distress is committed by 'one who by extreme and outra-
geous conduct intentionally or recklessly causes severe emotional
distress to another[.]'"  ***Branham v. Celadon Trucking Services,***

30

*Inc.*, 744 N.E.2d 514, 522—23 (Ind. App. 2001) (*citing* and *quoting*
*Ledbetter v. Ross*, 725 N.E.2d 120, 123—24 (Ind. App. 2000)). The
basis of the tort is the intent to harm emotionally. *Ledbetter,*
725 N.E.2d at 124. The tort occurs when a defendant (1) engages
in extreme and outrageous conduct that (2) intentionally or
recklessly (3) causes (4) severe emotional distress to another.
*Branham*, 744 N.E.2d at 523.

Indiana courts regularly quote Section 46 of the Restate-
ment (Second) of Torts in describing the extreme and outrageous
conduct required to sustain a cause of action for this tort:

> Extreme and outrageous conduct. The cases
> thus far decided have found liability only
> where the defendant's conduct has been ex-
> treme and outrageous. It has not been enough
> that the defendant has acted with an intent
> which is tortious or even criminal, or that
> he has intended to inflict emotional dis-
> tress, or even that his conduct has been
> characterized by "malice," or a degree of
> aggravation which would entitle the plaintiff
> to punitive damages for another tort. Liabil-
> ity has been found only where the conduct has
> been so outrageous in character, and so ex-
> treme in degree, as to go beyond all possible
> bounds of decency, and to be regarded as
> atrocious, and utterly intolerable in a civi-
> lized community. Generally, the case is one
> in which the recitation of the facts to an
> average member of the community would arouse
> his resentment against the actor, and lead
> him to exclaim, "Outrageous!"

*Creel v. I.C.E. & Associates, Inc.*, 771 N.E.2d 1276, 1282 (Ind.
App. 2002); *Branham*, 744 N.E.2d at 523; *Bradley v. Hall*, 720

31

N.E.2d 747, 752—53 (Ind. App. 1999); *Gable v. Curtis*, 673 N.E.2d 805, 809—10 (Ind. App. 1996). Defining extreme and outrageous conduct depends upon the prevailing cultural norms and values. *Bradley*, 720 N.E.2d at 753. "In the appropriate case, the question can be decided as a matter of law." *Dietz v. Finlay Fine Jewelry Corp.*, 754 N.E.2d 958, 970 (Ind. App. 2001). *Compare Bradley*, 720 N.E.2d at 752 (finding that a genuine issue of material fact existed as to whether supervisor engaged in extreme and outrageous conduct by allegedly shouting at the employee, criticizing her work in front of other employees, inquiring about her menopause and whether her husband was sexually impotent from his diabetes, and misrepresenting the security of her position of employment) and *Mitchell v. Stevenson*, 677 N.E.2d 551, 563—64 (Ind. App. 1997) (finding that disinterring deceased's remains, removing headstone, and cremating deceased against the wishes of deceased and other family members was extreme and outrageous conduct) with *Lindsey v. DeGroot*, 898 N.E.2d 1251, 1264—65 (Ind. App. 2009) (finding that dairy employees' alleged nuisance, negligence, trespass, and criminal mischief were not extreme and outrageous conduct); *Lachenman v. Stice*, 838 N.E.2d 451, 457 (Ind. App. 2005) (finding that failure to control dog which attacked and killed the plaintiff's dog was not extreme and outrageous conduct); *Conwell v. Beatty*, 667 N.E.2d 768, 775—76

(Ind. App. 1996) (finding no outrageous conduct where a sheriff announced a deputy's arrest at a press conference and refused to assist that deputy in completing retirement forms); and *Gable*, 673 N.E.2d at 811 (holding that large number of phone calls lacking obscenity or threatened violence, whether or not justified, was not sufficiently outrageous to state a cause of action).

Williams did not respond to U.S. Steel's argument in support of summary judgment on this issue.  The court assumes Williams is relying on the same isolated incidents that she cited in support of her claim for gender harassment.  By failing to respond, Williams has not demonstrated that U.S. Steel's conduct was so extreme and outrageous as to cause emotional distress, nor has she made any effort to establish the requisite intent.  In light of these failures, U.S. Steel's motion for summary judgment must be granted on this issue.

Williams failed to show that U.S. Steel's stated reason for reassigning her to a non-line position was a pretext for gender discrimination or that she was subject to a hostile environment because of her gender.  Additionally, her failure to respond to U.S. Steel's motion for summary judgment on her state law claims is fatal to her allegations of negligent hiring and retention and intentional infliction of emotional distress.

_____

Based on the foregoing, the Motion for Summary Judgment [DE 18] filed by the defendant, United States Steel Corporation, on February 29, 2012, is **GRANTED.**

ENTERED this 6th day of August, 2012

s/ ANDREW P. RODOVICH
United States Magistrate Judge